UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**DR. GIORDON STARK,**

Plaintiff,

Case No.: 26-643

**- against –**

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

**THE SHUBERT ORGANIZATION, INC.,**

Defendant.

Plaintiff Dr. Giordon Stark ("Dr. Stark"), by and through his undersigned counsel, brings this action for declaratory relief, injunctive relief, and damages against Defendant The Shubert Organization, Inc. ("Shubert"), and alleges as follows:

**PRELIMINARY STATEMENT**

1. This action challenges the discriminatory and unlawful practices of The Shubert Organization, Inc., one of Broadway's largest and most powerful theater operators, which denied Dr. Giordon Stark, a Deaf theatre patron and avid theatregoer, equal access to the musical Maybe Happy Ending and continues to maintain policies and practices that deny him and other Deaf patrons equal opportunity to experience Broadway theater on the same terms as hearing patrons.

2. Dr. Stark is a passionate enthusiast of live theatre who has attended over 200 theatrical productions throughout his life when ASL interpretation has been provided. Theatre is a central

part of Dr. Stark's cultural and social life, and he travels regularly to New York City where he wishes to attend productions at Broadway theaters, including Shubert's seventeen venues.

3.  In June 2025, Dr. Stark sought to attend Maybe Happy Ending at Shubert's Belasco Theatre with American Sign Language ("ASL") interpretation during the show's Original Broadway Cast tenure. For over four months, Dr. Stark attempted in good faith to secure this basic accommodation required by federal, state, and city law. Instead of providing equal access, Shubert and its agents subjected him to a bureaucratic runaround, deflecting responsibility to third parties, providing misinformation, and offering ineffective technological substitutes that fail to provide meaningful access to live musical performances.

4.  The single ASL performance offered by Shubert was scheduled for September 17, 2025—more than two weeks after the announced departure of the show's lead actor, Darren Criss, on August 31, 2025. While hearing patrons could select from hundreds of performances during the Original Broadway Cast's tenure based on their schedules and preferences, Deaf patrons who required ASL interpretation were restricted to a single scheduled performance that occurred after the OBC had departed. This disparity in choice and opportunity violated the most fundamental principle of civil rights law: persons with disabilities must receive equal—not separate and inferior—access to public accommodations.

5.  As a direct result of Shubert's discrimination, Dr. Stark was permanently denied the opportunity to experience Maybe Happy Ending with its Original Broadway Cast—an opportunity freely available to hearing patrons. This loss cannot be remedied or undone.

6.  Shubert's discriminatory conduct was not an isolated incident but reflects systemic policies and practices that continue to deny Deaf patrons equal access to Broadway theater. Upon information and belief, Broadway theaters provide ASL-interpreted performances at only

approximately one to two times per month across all Broadway productions combined—dramatically less frequent than regional theaters nationwide, which typically provide ASL interpretation for at least one performance per production. Shubert maintains no policy or procedure for patrons to request ASL interpretation with reasonable advance notice and continues to delegate responsibility for accessibility to third parties.

7.  Dr. Stark continues to face these discriminatory barriers. He wishes to attend future theatrical productions at Shubert's seventeen Broadway theaters but has no assurance that ASL interpretation will be available when he travels to New York. Shubert's failure to establish accessible policies and procedures deters Dr. Stark from purchasing tickets and denies him the opportunity to participate in Broadway theater on equal terms with hearing patrons.

8.  This discrimination violates Dr. Stark's civil rights under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq.; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq.

9.  Dr. Stark seeks declaratory relief establishing that Shubert's past conduct violated federal, state, and city law; compensatory and punitive damages for the harm he has suffered; and permanent injunctive relief requiring Shubert to reform its discriminatory policies to ensure that Dr. Stark and other Deaf patrons can access future theatrical productions with ASL interpretation upon reasonable request.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as the claims herein arise under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

11. This Court has supplemental jurisdiction over the related claims arising under the New York State Human Rights Law and the New York City Human Rights Law pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant Shubert maintains its principal place of business in this district, and all events and omissions giving rise to the claims occurred within this judicial district.

**PARTIES**

13. Plaintiff Dr. Giordon Stark is a Deaf individual and a resident of Santa Cruz, California. Dr. Stark has bilateral, congenital, severe-to-profound sensorineural hearing loss        . He communicates using American Sign Language and is also proficient in written and spoken English. Dr. Stark is a distinguished particle physicist employed at the Santa Cruz Institute for Particle Physics at the University of California, Santa Cruz. As a Deaf individual, Dr. Stark has a "disability" as that term is defined in 42 U.S.C. § 12102(1), N.Y. Exec. Law § 292(21), and N.Y.C. Admin. Code § 8-102(16).

14. Dr. Stark is an avid and passionate lover of live theatre. Over the course of his life, Dr. Stark has attended more than 200 theatrical productions when ASL interpretation has been provided, including productions in the San Francisco Bay Area, New York City, and cities across

the United States and internationally. Theatre is a central component of Dr. Stark's cultural, intellectual, and social life.

15. Dr. Stark travels to New York City regularly—typically several times per year—for professional conferences, collaborative research meetings at New York University, Brookhaven National Lab,     and other institutions, and personal visits. During these trips to New York, Dr. Stark seeks to attend Broadway and off-Broadway theatrical productions as an integral part of his experience of New York's cultural life.

16. Dr. Stark wishes to continue attending theatrical productions at Shubert theaters and other Broadway venues during his regular visits to New York City. However, Shubert's discriminatory policies and practices deter him from purchasing tickets because he has no assurance that ASL interpretation will be available.

17. Defendant The Shubert Organization, Inc. is a New York corporation with its principal place of business at 234 West 44th Street, New York, NY 10036. Shubert is one of the three major Broadway theater operators and owns and operates seventeen Broadway theatres in New York City, including the Belasco Theatre located at 111 West 44th Street, New York, NY 10036. Shubert's theaters present live theatrical productions and sell tickets to the general public, generating substantial revenue from ticket sales at premium prices.

18. The Belasco Theatre and Shubert's other theaters are "exhibition or entertainment" establishments and "places of public accommodation" within the meaning of 42 U.S.C. § 12181(7)(C), N.Y. Exec. Law § 292(9), and N.Y.C. Admin. Code § 8-102(9).

19. Upon information and belief, Shubert received federal financial assistance within the meaning of Section 504 of the Rehabilitation Act through the Shuttered Venue Operators Grant ("SVOG") program administered by the U.S. Small Business Administration. The SVOG program,

established by the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act and funded with over $16 billion in federal appropriations, provided grants of up to $10 million to eligible live venue operators, including Broadway theater owners. Broadway theater owners were among the recipients of SVOG funds, and Shubert, as the owner and operator of seventeen Broadway theaters that were shuttered during the COVID-19 pandemic, was eligible to receive such federal grants.

## FACTUAL ALLEGATIONS

### A. Dr. Stark's Disability and Communication Needs

20. Dr. Stark is Deaf and has congenital,    bilateral, severe-to-profound sensorineural hearing loss. He cannot hear spoken dialogue, song lyrics, or musical elements of theatrical performances without auxiliary aids.

21. Dr. Stark grew up oral and uses both spoken/written English and American Sign Language to communicate and prefers ASL interpretation for accessing theatrical performances. While Dr. Stark is proficient in English, ASL interpretation is essential for him to fully experience live theatrical productions for several critical reasons.

22. Live theatrical performances involve complex, simultaneous communication through multiple channels: spoken dialogue, sung lyrics, musical accompaniment, vocal intonation and emphasis, timing and pacing of delivery, emotional expression through voice, and the physical staging and action occurring on stage.

23. ASL interpretation by qualified theatrical interpreters conveys not merely the literal content of words, but the manner in which they are delivered—the sarcasm, humor, anger, tenderness, urgency, hesitation, and countless other performance elements that define live theater. ASL

interpreters are trained to match the rhythm, pace, and emotional quality of the performers' delivery, allowing Deaf audience members to experience these artistic choices.

24. ASL interpretation allows Dr. Stark to watch the performance continuously while receiving communication access, mirroring the experience of hearing patrons who can simultaneously listen to dialogue and music while watching the staging, choreography, and actors' physical performances.

25. By contrast, captioning technologies—whether handheld devices like GalaPro or open captioning displays—require Dr. Stark to divert his visual attention away from the stage to read text. This forces him to choose between watching the performance and reading the words, fragmenting his experience in a way that hearing patrons never experience.

26. The proximal distance of handheld captioning requires constant adjustment of the visual focal length which places additional strain on the eyes and neck as well as adjusting to the difference in lighting between stage and screen. The screen can also be a distraction to audience members around the user.

27. Captioning provides only a literal transcription of words and cannot convey the timing, emphasis, tone, emotional inflection, and artistic delivery choices that are integral to theatrical performance. Captions do not follow a consistent style from show to show, such as including character names or describing background sounds. Captions often lag behind the live action, creating confusion about which character is speaking and what staging corresponds to particular dialogue.

28. For musicals in particular, where song lyrics are interwoven with complex musical arrangements and emotional performance, ASL interpretation is essential to convey the integration

of lyrics with melody, rhythm, and the emotional arc of musical numbers. Captioning reduces songs to text divorced from their musical context.

29. The effectiveness of ASL interpretation for theatrical performances is well-established and recognized by the Deaf community, theatrical professionals, and accessibility experts. Qualified theatrical interpreters receive specialized training in conveying the artistic and emotional elements of live performance.

**B. Dr. Stark's Extensive Theatre-Going History and Commitment to Live Theatre**

30. Dr. Stark's love of theatre began in childhood and has remained a central passion throughout his life. Over more than three decades, Dr. Stark has attended over 200 theatrical productions when accessible accommodations such as ASL interpretation has been provided.

31. Dr. Stark has attended theatrical productions at venues including but not limited to: Raymond F. Kravis Center for the Performing Arts in West Palm Beach   , Studio 54 in New York , Orpheum Theatre    in San Francisco, Steppenwolf in Chicago   ,      the Goodman Theatre in Chicago, and numerous other regional theaters across the United States.

32. When traveling internationally for professional conferences, Dr. Stark has sought out and attended theatrical productions with ASL interpretation or other accessibility accommodations in London, Paris, Hamburg, and other cities.

33. Dr. Stark subscribes to season ticket packages at regional theaters in California when those theaters commit to providing ASL interpretation for designated performances. He plans his schedule around accessible performance dates and has traveled significant distances to attend interpreted performances.

34. Dr. Stark discusses theatrical productions with colleagues, friends, and fellow theatre enthusiasts. Theatre provides him with shared cultural experiences and common ground for social

and intellectual discourse. Being unable to access Broadway productions on equal terms with hearing patrons excludes him from these discussions and diminishes his ability to participate fully in cultural life.

35. Dr. Stark follows Broadway productions closely, reads reviews, listens to cast recordings, and maintains a keen interest in attending Broadway shows during his regular trips to New York City. However, the lack of accessible performances at predictable intervals deters him from purchasing tickets to Shubert theaters.

**C. Dr. Stark's Attempts to Access Maybe Happy Ending**

36. In early 2025, Dr. Stark learned of Maybe Happy Ending (the "Show"), a new musical opening at Shubert's Belasco Theatre. As a physicist, Dr. Stark was particularly interested in the Show's set design and science fiction themes exploring artificial intelligence, consciousness, and human connection—subjects relevant to his professional field and personal interests.

37. The Show opened with its Original Broadway Cast, featuring acclaimed actor and Tony Award nominee Darren Criss in the lead male role. Dr. Stark has followed Mr. Criss's career since his 2009 role in "A Very Potter Musical" by StarKid Productions, which is fully captioned on YouTube. The producers and Shubert prominently marketed the Original Broadway Cast in promotional materials, on the show's website, and in ticket sales, emphasizing the significance and limited availability of the OBC performances.

38. On or about June 13, 2025, the producers publicly announced that Darren Criss would perform his final performance in the Show on Sunday, August 31, 2025. This announcement was widely disseminated through press releases, social media, the show's official website, and entertainment news outlets.

39. Dr. Stark determined that he wished to attend a performance of the Show with ASL interpretation and began investigating accessibility options in June 2025.

40. On or about June 14, 2025, Dr. Stark initiated contact with Shubert's ticketing systems and accessibility services to inquire about ASL-interpreted performances of Maybe Happy Ending.

41. Dr. Stark was directed to contact Telecharge, Shubert's official ticketing vendor. Dr. Stark contacted Telecharge on June 14, 2025 and requested information about ASL-interpreted performances.

42. On June 17, 2025, a Telecharge representative responded to Dr. Stark, confirming that the only scheduled ASL-interpreted performance for Maybe Happy Ending was September 17, 2025—more than two weeks after the announced final performance of the Original Broadway Cast on August 31, 2025.

43. Dr. Stark immediately responded on June 17, 2025, explaining the inequality of this arrangement and specifically requesting access to a performance during the OBC's tenure. Dr. Stark wrote: "That's unfortunate, as I believe the OBC version ends in the end of August with Darren Criss leaving. There is no performance that will be ASL interpreted before that happens? I would like to be able to access the show like everyone else with the original leads."

44. Receiving no satisfactory response from Telecharge, Dr. Stark contacted Shubert's Audience Services department directly on June 18, 2025, reiterating his request for ASL interpretation during a performance featuring the Original Broadway Cast.

45. On June 18, 2025, Kayla M., an Audience Services Coordinator for Shubert, responded to Dr. Stark, stating only that "September 17th is the performance with ASL interpretation" and deflecting responsibility by claiming that "ASL performances are planned by the production in advance."

46. Dr. Stark again explained on June 18, 2025 that the September 17 performance would not provide equal access because it occurred after the departure of the Original Broadway Cast, and he specifically requested that Shubert arrange ASL interpretation for a performance before August 31, 2025.

47. On June 20, 2025, Shubert's Audience Services department sent Dr. Stark a response explicitly refusing to arrange ASL interpretation. The email stated: "Unfortunately, we are not able to organize ASL interpretation at our theatres."

48. Instead of providing the requested accommodation, Shubert's representative directed Dr. Stark to use handheld captioning devices available through the GalaPro mobile application or caption displays.

49. Dr. Stark explained that these text-based services do not provide effective communication for the reasons set forth above and again requested ASL interpretation for a performance during the OBC's tenure.

50. Throughout June, July, and August 2025, Dr. Stark made repeated inquiries to Shubert, Telecharge, and other entities, attempting to secure ASL interpretation for a performance before August 31, 2025. In each instance, Dr. Stark was told that September 17 was the only scheduled ASL performance or was directed to contact other organizations.

**D. The Bureaucratic Runaround and Abdication of Responsibility**

51. Throughout these communications, Shubert and its agents repeatedly attempted to shift legal responsibility for providing access to third parties, creating a circular pattern of deflection that frustrated Dr. Stark's legitimate requests for accommodation.

52. Shubert's representatives variously directed Dr. Stark to contact "the production," the Theatre Development Fund ("TDF"), the third-party organization named Hands On, and Telecharge. No entity accepted responsibility for scheduling ASL interpretation at a time that would provide Dr. Stark equal access to the Original Broadway Cast performances.

53. Following Shubert's instructions, Dr. Stark contacted Hands On, an organization that provides theatrical ASL interpretation services. On July 8, 2025, Beth Prevor, Executive Director of Hands On, responded to Dr. Stark, confirming that Hands On is merely a subcontractor with no authority to schedule interpreted performances. Ms. Prevor stated: "we are hired by the theaters to do their interpreted performance on the date we're scheduled for and I really have no other authority or ability to add or change dates."

54. Ms. Prevor's response made clear that scheduling authority rests with Shubert, not with Hands On or any other third-party contractor. Yet when Dr. Stark returned to Shubert with this information, Shubert continued to refuse to schedule additional ASL-interpreted performances.

55. This circular finger-pointing served only to obstruct Dr. Stark's legitimate requests for accommodation and left him without a clear path to vindicate his civil rights.

56. At no point did Shubert engage in any meaningful cooperative dialogue with Dr. Stark about his accommodation needs, potential solutions, alternative performance dates, or any difficulties that providing ASL interpretation might pose. Shubert simply refused to provide the requested accommodation and directed Dr. Stark to use inadequate technological substitutes or attend the single scheduled performance occurring after the OBC's departure.

57. August 31, 2025 passed. Darren Criss and other members of the Original Broadway Cast completed their tenures with the Show. Dr. Stark never had the opportunity to attend a performance with ASL interpretation featuring the Original Broadway Cast, despite having requested this

accommodation more than two months in advance. This opportunity is now permanently lost and can never be remedied.

### E. Shubert's Discriminatory Policies and Practices

58. Shubert's conduct toward Dr. Stark was not an isolated incident but reflects systemic policies, practices, and procedures that deny Deaf patrons equal access to Shubert's theaters.

59. Shubert is one of the three largest Broadway theater operators, with seventeen theaters in New York City presenting diverse theatrical productions year-round. Shubert is a highly sophisticated and well-resourced entity with substantial annual revenues from ticket sales, concessions, and related theatrical operations.

60. Shubert has been subject to federal accessibility enforcement in the past. In 2003, Shubert entered into a consent decree with the United States Department of Justice requiring physical accessibility improvements at its theaters.

61. Despite this history and knowledge of ADA obligations, Shubert maintains policies and practices that systematically deny Deaf patrons equal access to theatrical performances.

62. Shubert maintains a published accessibility policy on its website at shubert.nyc/accessibility/.

63. Shubert's accessibility policy emphasizes technology-based accommodations available at all performances, including assistive listening devices, handheld captioning devices, and audio description. The policy states these aids are available beginning four weeks after a show opens.

64. However, Shubert's published accessibility policy makes no commitment to regularly scheduled ASL-interpreted performances and provides no procedure for patrons to request ASL interpretation with reasonable advance notice. The policy states only that "Many shows in Shubert

theatres schedule performances for people with hearing loss" and directs patrons to the third-party website TheatreAccess.nyc for information about interpreted performances.

65. Shubert's accessibility policy effectively delegates scheduling of ASL interpretation to external organizations rather than accepting responsibility as the theater operator to provide auxiliary aids upon request.

66. Shubert provides no mechanism for patrons to request ASL interpretation for specific performances or to provide advance notice of their need for this accommodation. Patrons are left to check third-party websites and hope that an accessible performance coincidentally aligns with their schedules.

67. This policy and practice fails to comply with the ADA's requirement that public accommodations provide appropriate auxiliary aids in a timely manner upon request. 28 C.F.R. § 36.303.

68. As a result of these policies and practices, Dr. Stark has no assurance that ASL interpretation will be available when he wishes to attend productions at Shubert theaters during his visits to New York. He is deterred from purchasing tickets to Shubert productions because of the substantial likelihood that accessibility will not be provided.

69. Dr. Stark faces a real and immediate threat of future injury from Shubert's discriminatory policies. Unless Shubert is required to reform its policies and establish procedures for providing ASL interpretation upon reasonable request, Dr. Stark will continue to be denied equal access to Shubert's theaters.

**F. Industry-Wide Pattern of Inadequate ASL Access**

70. Upon information and belief, Shubert's failure to provide adequate ASL interpretation reflects a pattern and practice affecting the Broadway theater industry broadly.

71. Upon information and belief, Broadway theaters collectively provide ASL-interpreted performances at only approximately one to two times per month across all Broadway productions combined. With over 40 Broadway theaters presenting productions, this amounts to approximately 12-24 ASL performances annually industry-wide.

72. By contrast, upon information and belief, Broadway theaters provide open captioning (text displays) substantially more frequently—approximately 70 captioned performances per season according to Theatre Development Fund data.

73. This disparity reflects an industry-wide decision to prioritize captioning technology over ASL interpretation, despite the fact that these serve distinct populations with different communication needs and preferences.

74. Regional theaters across the United States typically provide ASL interpretation for at least one performance per production—substantially more frequent than Broadway practices. Examples include the Counterpulse in San Francisco  , the Goodman Theatre in Chicago, Cabrillo Stage in Aptos  , Paramount Theatre in Aurora  , and Providence Performing Arts Center in Rhode Island , all of which schedule ASL interpretation more regularly than Broadway theaters.

75. Upon information and belief, the Broadway theater industry, including Shubert, has shifted away from providing ASL-interpreted performances over the past decade despite the Deaf community's documented need for such services and the requirements of the ADA.

76. This industry-wide practice denies the Deaf signing community equal access to Broadway theater and reflects a systemic failure to comply with federal, state, and local accessibility laws.

**G. Harm to Deaf patrons such as Dr. Stark**

77. As a direct result of Shubert's discriminatory actions, Dr. Stark was permanently denied the opportunity to experience Maybe Happy Ending with its Original Broadway Cast. This opportunity, which was freely available to hearing patrons who could select from hundreds of performances, can never be restored.

78. While hearing patrons had the opportunity to choose from hundreds of performances during the OBC's tenure based on their schedules and preferences, Dr. Stark—despite requesting accommodation more than two months in advance—was offered only a single performance scheduled after the OBC's departure. This separate and unequal access constitutes discrimination in its most fundamental form.

79. Dr. Stark suffered and continues to suffer significant emotional distress, frustration, humiliation, and feelings of exclusion as a result of Shubert's discrimination.

80. Dr. Stark was made to feel that he is not welcome at Shubert's theaters and that his needs as a Deaf person are not valued or respected.

81. Dr. Stark was unable to participate in cultural discussions about Maybe Happy Ending with colleagues, friends, and the broader community who attended performances during the Original Broadway Cast's tenure. This exclusion from shared cultural experiences caused additional harm and reinforced Dr. Stark's sense of being treated as a second-class patron.

82. Dr. Stark continues to suffer ongoing harm from Shubert's discriminatory policies. As an avid theatregoer who wishes to attend productions at Shubert's seventeen Broadway theaters during his regular visits to New York, Dr. Stark is deterred from purchasing tickets because he has no assurance that ASL interpretation will be available. This ongoing deterrent effect denies him equal participation in Broadway theater.

83. Dr. Stark has been forced to limit his theatrical experiences in New York to the small subset of productions that happen to offer ASL interpretation at times that coincide with his travel schedule—a restriction that hearing patrons never face.

84. The harm to Dr. Stark is ongoing and will continue absent injunctive relief requiring Shubert to establish policies and procedures that ensure equal access to future productions.

## FIRST CAUSE OF ACTION

**Failure to Provide Auxiliary Aids and Services in Violation of Title III of the Americans with Disabilities Act
42 U.S.C. § 12182(b)(2)(A)(iii)**

85. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-84.

86. Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

87. Discrimination under Title III includes the failure "to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

88. Department of Justice regulations implementing Title III require a public accommodation to "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c).

89. The determination of what constitutes effective communication must be made through an individualized assessment considering: (1) the nature, length, complexity, and context of the

communication; and (2) the person's normal method of communication. 28 C.F.R. § 36.303(c)(1)(ii).

90. Auxiliary aids must be provided in a "timely manner" and must be effective—that is, they must provide communications to individuals with disabilities that are "as effective as communications with others." 28 C.F.R. § 36.303(a), (c)(1)(ii).

91. "Qualified interpreters" are explicitly identified as a required auxiliary aid. 28 C.F.R. § 36.303(b)(1).

92. Dr. Stark is an individual with a disability within the meaning of the ADA. The Belasco Theatre and Shubert's other theaters are places of public accommodation covered by Title III of the ADA.

93. Dr. Stark requested ASL interpretation as an auxiliary aid to enable him to effectively experience Maybe Happy Ending, a complex theatrical performance involving intricate dialogue, musical performances, and artistic expression. Dr. Stark made this request more than two months before the desired performance date, providing ample advance notice.

94. ASL interpretation by qualified theatrical interpreters is necessary to ensure effective communication for Dr. Stark in the context of live theater. Given the complex, multi-layered nature of theatrical performances and Dr. Stark's preference for ASL communication, text-based captioning does not provide communication that is as effective as the communication hearing patrons receive.

95. Shubert failed to provide ASL interpretation for any performance during the Original Broadway Cast's tenure despite Dr. Stark's timely request. Instead, Shubert offered only: (a) a single ASL-interpreted performance scheduled for September 17, 2025, more than two weeks after

the OBC's departure, which did not provide equal access; and (b) text-based captioning devices, which do not provide effective communication.

96. Shubert maintains policies and practices that continue to deny Dr. Stark and other Deaf patrons equal access to Shubert's theaters. Shubert provides no procedure for patrons to request ASL interpretation with reasonable advance notice and maintains no policy requiring the provision of such interpretation upon request.

97. ASL interpretation for live theatrical performances is a reasonable auxiliary aid explicitly contemplated by the ADA's regulations. Providing ASL interpretation does not fundamentally alter Shubert's services because the theatrical performance itself remains unchanged. The cost of providing ASL interpretation is not an undue burden given Shubert's substantial resources.

98. By failing to provide ASL interpretation during the Original Broadway Cast's tenure and by maintaining policies that continue to deny Dr. Stark equal access to future productions, Shubert has violated and continues to violate its obligations under 42 U.S.C. § 12182(b)(2)(A)(iii) and the implementing regulations.

---

**SECOND CAUSE OF ACTION**

**Denial of Full and Equal Enjoyment in Violation of Title III of the Americans with Disabilities Act**
**42 U.S.C. § 12182(b)(1)(A)**

99. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-98.

100.      The ADA prohibits discrimination in the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

101.    Section 12182(b)(1)(A) specifically prohibits denying individuals with disabilities "the opportunity... to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity."

102.    "Full and equal enjoyment" requires that persons with disabilities receive not merely some access, but access that is equivalent in quality, scope, and opportunity to the access provided to non-disabled persons.

103.    During the Original Broadway Cast's tenure through August 31, 2025, Shubert offered Maybe Happy Ending at approximately eight performances per week, totaling hundreds of performances. Hearing patrons could select from these hundreds of performances based on their schedules, preferences, and desire to see particular cast members.

104.    By contrast, Shubert provided ASL interpretation at only one performance— scheduled for September 17, 2025, after the Original Broadway Cast had departed. This restriction forced Deaf patrons who required ASL interpretation either to attend that single performance after the OBC's departure or forgo access to the Show with the OBC entirely.

105.    This disparity denied Deaf patrons the full and equal enjoyment of Shubert's services by: (a) restricting their choice of performance dates to a single option occurring at an inferior time, while hearing patrons could choose from hundreds of performances; (b) denying them the opportunity to attend during the Original Broadway Cast's tenure while hearing patrons had that opportunity; and (c) denying them the flexibility to schedule attendance based on their personal and professional schedules while hearing patrons had such flexibility.

106.    Shubert's current policies and practices continue to deny Dr. Stark full and equal enjoyment of Shubert's theaters. Without established procedures for requesting ASL interpretation or any assurance that such interpretation will be provided, Dr. Stark cannot access Shubert's

theaters on equal terms with hearing patrons who can purchase tickets to any performance at any time.

107.    The harm to Dr. Stark is not based on subjective aesthetic preference but on the objective denial of equal opportunity and choice. Shubert created and maintains a two-tiered system in which hearing patrons receive extensive scheduling flexibility and choice while Deaf patrons receive take-it-or-leave-it options at inferior times or no access at all.

108.    By limiting ASL interpretation to infrequent performances scheduled without regard to patron needs, and by maintaining policies that provide no mechanism for patrons to request accessible performances, Shubert has denied and continues to deny Dr. Stark the opportunity to participate in and benefit from Shubert's services in violation of 42 U.S.C. § 12182(b)(1)(A).

---

### THIRD CAUSE OF ACTION

**Failure to Make Reasonable Modifications in Policies, Practices, and Procedures in Violation of Title III of the Americans with Disabilities Act**
**42 U.S.C. § 12182(b)(2)(A)(ii)**

109.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-108.

110.    The ADA prohibits "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

111.    Shubert's policies, practices, and procedures include:

a. Scheduling ASL interpretation only sporadically and infrequently, with no regard to patron requests or needs;

b. Refusing to schedule ASL interpretation upon request by patrons with disabilities who provide reasonable advance notice;

c. Delegating scheduling of ASL interpretation to third-party organizations rather than accepting responsibility as the theater operator;

d. Offering only text-based technology accommodations as an alternative to ASL interpretation;

e. Providing no published procedure or policy for patrons to request ASL interpretation; and

f. Maintaining no system for tracking or responding to requests for ASL interpretation.

112.    These policies, practices, and procedures have the effect of denying or limiting access to Shubert's theaters for Deaf individuals who use ASL, including Dr. Stark.

113.    Reasonable modifications to these policies, practices, and procedures are necessary to afford Dr. Stark and other Deaf patrons equal access to Shubert's theaters. Such modifications include:

a. Establishing and publicizing a procedure for patrons to request ASL interpretation with reasonable advance notice;

b. Providing ASL interpretation upon reasonable advance request by patrons (absent demonstration of undue burden or fundamental alteration);

c. Scheduling ASL interpretation at multiple performances per production to offer Deaf patrons meaningful choice of performance dates; and

d. Establishing a system for tracking requests and ensuring timely responses.

114.    These modifications are reasonable and would not fundamentally alter the nature of Shubert's services or impose an undue burden. The theatrical performance itself would remain unchanged; the modification affects only the means by which the performance is made accessible to Deaf patrons.

115.    Shubert bears the burden of demonstrating that such modifications would fundamentally alter its services, which it cannot satisfy.

116.    By failing to modify its policies, practices, and procedures to provide ASL interpretation upon reasonable request, Shubert has violated and continues to violate 42 U.S.C. § 12182(b)(2)(A)(ii).

---

**FOURTH CAUSE OF ACTION**

**Violation of Section 504 of the Rehabilitation Act**
**29 U.S.C. § 794**

117.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-116.

118.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability... shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

119.    Upon information and belief, Shubert received federal financial assistance within the meaning of Section 504 through the Shuttered Venue Operators Grant ("SVOG") program, 15 U.S.C. § 9009a, administered by the U.S. Small Business Administration ("SBA"). The SVOG program provided direct federal grants to eligible live venue operators, theatrical producers, and performing arts organizations that experienced revenue losses during the COVID-19 pandemic. Shubert, as the largest owner and operator of Broadway theaters in New York City, with seventeen theaters that were shuttered from March 2020 through September 2021, was eligible for and, upon information and belief, received SVOG grants. Receipt of SVOG funds constitutes federal financial assistance that subjects Shubert to the nondiscrimination requirements of Section 504 for its programs and activities, including the operation of all theaters owned or controlled by Shubert.

120.    As a recipient of federal financial assistance, Shubert is subject to the requirements of Section 504.

121.    Dr. Stark is an individual with a disability within the meaning of Section 504. He is otherwise qualified to attend theatrical performances at Shubert's theaters.

122.    The substantive requirements of Section 504 are coextensive with Title III of the ADA. The conduct alleged above constitutes discrimination in violation of Section 504.

123.    Shubert has excluded Dr. Stark from participation in and denied him the benefits of theatrical performances at the Belasco Theatre and continues to exclude him from equal participation in future performances at Shubert's theaters solely by reason of his disability, in violation of 29 U.S.C. § 794.

124.     Shubert's conduct was undertaken with deliberate indifference to Dr. Stark's federally protected rights. Shubert had knowledge that its failure to provide ASL interpretation was substantially likely to result in violation of Dr. Stark's rights, yet failed to take reasonable steps to prevent such violation.

125.     As a result of Shubert's violations of Section 504, Dr. Stark is entitled to compensatory damages, injunctive relief, and attorney's fees.

## FIFTH CAUSE OF ACTION

**Violation of the New York City Human Rights Law: Discrimination in Public Accommodation
N.Y.C. Admin. Code § 8-107(4)(a)**

126.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-125.

127.     The NYCHRL makes it an unlawful discriminatory practice for the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation "to refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, facilities, services or privileges of the place or provider of public accommodation" because of the person's actual or perceived disability. N.Y.C. Admin. Code § 8-107(4)(a).

128.     The NYCHRL must be construed "liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130.

129.     The NYCHRL is to be construed "independently from similar or identical provisions of New York state or federal statutes." Federal and state law serve as "a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise." N.Y.C. Admin. Code § 8-130.

130.     Under the NYCHRL, Dr. Stark need only show that he was treated "less well" than non-disabled persons because of his disability.

131.     Shubert is the owner and operator of the Belasco Theatre and sixteen other Broadway theaters, all of which are places of public accommodation. Dr. Stark has a disability within the meaning of the NYCHRL.

132.     By failing to provide ASL interpretation for performances during the Original Broadway Cast's tenure, by offering only a single ASL performance after the OBC's departure, by offering only inadequate text-based alternatives, and by maintaining policies that provide no mechanism for requesting ASL interpretation, Shubert has refused to provide Dr. Stark the full and equal enjoyment of its theaters on equal terms and conditions.

133.     Shubert has treated Dr. Stark less well than non-disabled patrons by denying him the opportunity to choose from the full range of available performances, restricting him to inferior options or no access at all, failing to provide effective auxiliary aids, and maintaining policies that deter him from attending future productions.

134.     This disparate treatment was and continues to be because of Dr. Stark's disability as a Deaf person.

135.     Under the NYCHRL, all accommodations are presumed reasonable, and the burden is on Shubert to prove that providing ASL interpretation would pose an undue hardship. Romanello v. Intesa Sanpaolo, 22 N.Y.3d 881 (2013). Shubert cannot satisfy this burden.

136.     Shubert's conduct constitutes discrimination in violation of N.Y.C. Admin. Code § 8-107(4)(a).

137.     As a result of Shubert's discrimination, Dr. Stark has suffered and continues to suffer emotional distress, humiliation, frustration, loss of opportunity, and dignitary harm.

138.     Shubert's conduct was undertaken with willful or wanton negligence, recklessness, or in conscious disregard of Dr. Stark's rights, warranting an award of punitive damages under the NYCHRL.

---

## SIXTH CAUSE OF ACTION

### Violation of the New York City Human Rights Law: Failure to Engage in Cooperative Dialogue
### N.Y.C. Admin. Code § 8-107(28)

139.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-138.

140.     The NYCHRL creates a standalone cause of action for failure to engage in a cooperative dialogue regarding reasonable accommodation. N.Y.C. Admin. Code § 8-107(28).

141.     An employer or place of public accommodation "shall engage in a cooperative dialogue with the person requesting an accommodation to determine whether there is a reasonable accommodation." N.Y.C. Admin. Code § 8-107(28)(a).

142.     The cooperative dialogue must be "a good faith written or oral dialogue concerning the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose." N.Y.C. Admin. Code § 8-107(28)(c).

143.    The duty to engage in cooperative dialogue is triggered when an entity "has knowledge that a person may have a need for reasonable accommodation." N.Y.C. Admin. Code § 8-107(28)(a).

144.    Shubert had knowledge that Dr. Stark, as a Deaf patron, had a need for reasonable accommodation to access Maybe Happy Ending. Dr. Stark explicitly communicated this need through his June 2025 requests for ASL interpretation.

145.    Despite this knowledge, Shubert failed to engage in any meaningful cooperative dialogue with Dr. Stark. Shubert did not discuss Dr. Stark's specific accommodation needs, did not explore potential accommodations beyond directing him to inadequate technology, did not discuss alternative performance dates that might provide equivalent access, and did not discuss any difficulties that providing ASL interpretation might pose.

146.    Instead, Shubert offered only cursory responses directing Dr. Stark to the September 17 performance or to text-based technology, without engaging in good faith dialogue about how to meet his actual needs.

147.    Shubert's failure to engage in cooperative dialogue is an independent violation of N.Y.C. Admin. Code § 8-107(28), regardless of whether Shubert was ultimately required to provide the requested accommodation.

---

**SEVENTH CAUSE OF ACTION**

**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law § 296(2)(a)**

148.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-147

149.     The NYSHRL makes it an unlawful discriminatory practice for the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation "to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof...because of...disability." N.Y. Exec. Law § 296(2)(a).

150.     The NYSHRL requires places of public accommodation to provide reasonable accommodations to persons with disabilities.

151.     Dr. Stark has a disability within the meaning of the NYSHRL as a Deaf person with profound hearing loss. Shubert is the owner and operator of seventeen Broadway theaters, all of which are places of public accommodation.

152.     By failing to provide ASL interpretation for performances during the Original Broadway Cast's tenure despite Dr. Stark's timely request, and by maintaining policies that continue to deny equal access to future productions, Shubert has refused to provide a reasonable accommodation and has denied Dr. Stark the full and equal enjoyment of its theaters on the basis of his disability.

153.     Shubert's conduct violates N.Y. Exec. Law § 296(2)(a).

154.     As a result of Shubert's discrimination, Dr. Stark has suffered and continues to suffer emotional distress, humiliation, frustration, loss of opportunity, and dignitary harm.

---

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Giordon Stark respectfully requests that this Court enter judgment against Defendant The Shubert Organization, Inc. and grant the following relief:

**A. DECLARATORY JUDGMENT** that Defendant's policies, practices, and conduct as alleged herein violated and continue to violate:

i. Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq.;

ii. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

iii. The New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.; and

iv. The New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.

**B. PERMANENT INJUNCTION** requiring Defendant to:

i. Adopt, implement, and publicize a comprehensive accessibility policy applicable to all Shubert-owned theaters that ensures the timely provision of American Sign Language interpretation and other auxiliary aids and services;

ii. Establish and publicize a clear, Deaf-accessible, user-friendly procedure for patrons to request ASL interpretation, with a requirement that Shubert respond to such requests within five (5) business days;

iii. Provide ASL interpretation upon reasonable advance request by patrons (defined as at least two weeks' notice), absent demonstration through individualized assessment and high-level determination that providing such interpretation would constitute an undue burden or fundamental alteration;

iv. Adopt and enforce policies requiring that Shubert take reasonable steps to minimize conflict, stigma, or hostility toward ASL interpretation by informing hearing patrons in advance

when selected or assigned seating may be affected by interpreter placement, and by ensuring that any necessary seat adjustments are handled by box office or house management staff, rather than Deaf patrons or interpreters, so that the provision of auxiliary aids is not undermined by audience complaints or perceived inconvenience;

v. For each production running longer than eight (8) weeks, including previews, at any Shubert theater, schedule at least one ASL-interpreted performance within the first eight (8) weeks of the production's run and provide additional ASL-interpreted performances at intervals of no more than eight (8) weeks throughout the production's run;

vi. Train all audience services staff, box office personnel, and customer-facing employees on the requirements of the ADA, Section 504, NYSHRL, and NYCHRL regarding auxiliary aids and reasonable accommodations, including specific training on how to process requests for ASL interpretation;

vii. Train house managers, lighting and technical staff, and stage management personnel on the requirements of the ADA, Section 504, NYSHRL, and NYCHRL as they relate to the implementation of auxiliary aids and reasonable accommodations during performances, including training on coordinating with ASL interpreters to ensure appropriate lighting, sightlines, placement, cues, and backstage protocols so that the inclusion of interpreters is effective, non-disruptive, and does not compromise audience or performer safety;

viii    . Establish a centralized system for tracking requests for ASL interpretation and other accommodations, responses provided, and accommodations delivered;

ix    . Post prominent notice on Shubert's website, in all email confirmations, and at all box offices informing patrons of their right to request ASL interpretation and the procedure for doing so;

x    . Designate a specific individual or office responsible for coordinating accessibility requests and ensuring compliance with accessibility laws;

xi   . Publish on Shubert's website and TheatreAccess.nyc a calendar of all scheduled ASL-interpreted performances at all Shubert theaters, updated monthly; and

xii. Report to the Court every six (6) months for a period of three (3) years regarding: (a) ASL-interpreted performances scheduled and provided; (b) patron requests for ASL interpretation received; (c) responses to such requests; (d) staff training completed; and (e) any claims of undue burden or fundamental alteration asserted.

**C. COMPENSATORY DAMAGES** in an amount to be determined at trial (Plaintiff acknowledges that Title III of the ADA provides only injunctive relief and attorneys' fees to private plaintiffs; compensatory damages are sought under the following statutes):

i. Compensatory damages to the extent available under Section 504 of the Rehabilitation Act;

ii. Emotional distress, humiliation, loss of opportunity, and dignitary harm under the New York City Human Rights Law; and

iii. Emotional distress, humiliation, loss of opportunity, and dignitary harm under the New York State Human Rights Law.

**D. PUNITIVE DAMAGES** under the New York City Human Rights Law in an amount sufficient to punish Defendant's willful, wanton, and reckless conduct and to deter similar conduct in the future;

**E. NOMINAL DAMAGES** for the violation of Plaintiff's civil rights under Section 504 of the Rehabilitation Act, the New York State Human Rights Law, and the New York City Human Rights Law;

**F.** An award of reasonable **ATTORNEYS' FEES, COSTS, AND LITIGATION EXPENSES** pursuant to:

    i. 42 U.S.C. § 12205 (ADA);

    ii. 29 U.S.C. § 794a(b) (Section 504);

    iii. N.Y. Exec. Law § 297(10) (NYSHRL); and

    iv. N.Y.C. Admin. Code § 8-502 (NYCHRL); and

**G.** Such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

**Dated:** January 25, 2026

Respectfully submitted,

/s/ *Andrew Rozynski*

Andrew Rozynski, Esq.
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
(212) 353-8700
arozynski@eandblaw.com